PETER SHIELDS, complainant,

*v.*

GREATER CAPE MAY, INCORPORATED, defendant.

[Decided April 20th, 1928.]

*Mr. Francis D. Weaver, Mr. Robert H. McCarter* and *Mr Arthur F. Egner,* for the complainant.

*Mr. Lindley M. Garrison, Mr. Carlyle Garrison* and *Mr. Thomas F. Gains* (of the Pennsylvania bar), for the defendant.

BACKES, V. C.

This stockholders' bill is to set aside, and if not set aside to have declared the amount due on four real estate mortgages made by the Cape May Real Estate Company to Nelson Z. Graves, the president of the company, February 21st, 1912, for $250,000; January 8th, 1913, for $75,000; November 4th, 1913, for $30,000, and February 14th, 1914, for $25,000. The attack on the last mentioned was abandoned. The company having been declared insolvent, Frank D. Schroth, receiver, was substituted as complainant.

The Cape May Real Estate Company was formed years ago to develop waste land at Cape May into a seashore resort. Much money had been sunk in the project when Graves bought a majority interest in the company, at a low figure, in 1911, and installed his own board of directors. Though the company's affairs were moribund he was venturesome and proceeded to put in more. Under the old regime, in 1907, the company had contracted with the federal government to dredge a four-hundred-acre basin and connecting channel

thirty feet deep, in Cape May Harbor, adjacent to the lands of the company, in consideration that the government open up and improve Cold Spring Inlet leading to the harbor. When Graves came on the scene the company had constructed a basin of some two hundred and fifty acres and the government had nearly completed the construction of jetties on either side of the inlet, seven hundred and fifty feet apart, extending from the harbor far seaward, and was about to dredge an entrance channel between the jetties fifteen feet deep, and twenty-five feet deep if the company would contribute $100,000 towards the dredging, which it failed to do. The government was carrying out its part of the bargain and the company had to go forward or suffer an action for damages. It decided to perform. The thing of most importance was the digging of the connecting channel from the head of the jetties to the basin, to make the basin commercially available, and this Graves undertook to do, and under date of January 4th, 1912, entered into an agreement with the company—

"To dredge from the harbor of Cape May from the point commencing at Sewell's Point at the line from which the United States government is to commence their part of the work of deepening the channel between the jetties erected by them, to any point within said harbor of Cape May as may be designated by the engineers of the Cap May Real Estate Company, the depth of excavation over the area dredged to be not less than thirty feet below mean low water, and not over thirty-three feet below mean low water."

In this undertaking the company had a secondary purpose, to fill in its low land with the dredged material so as to provide salable building lots, and to that end it was stipulated that Graves should—

"Deposit all of the material excavated upon land known as New Cape May, and shown on map attached to contract, and on the property known as Two-Mile Beach, at such points and in such quantities as may be determined necessary by the engineers of the Cape May Real Estate Company, except more particularly to deposit:

"*First*. On all that portion lying east of Princeton avenue in Plan 'A' of said Cape May Real Estate Company to the bulk [head] line established by said company, and between the northerly side of New Jersey avenue to the bulkhead line of the harbor, until such area be brought up to the grade established for the improvement of the

East Cape May property, in no case shall the material be required to be placed at a greater elevation than eleven feet above mean high water. [This location is known as 'Low Area No. 2' New Cape May.]

"*Second.* To deposit on the portion of the East Cape May property between Pittsburgh avenue and St. Louis avenue, and the northerly side of New Jersey avenue and the bulkhead line to be established by the engineers of the Cape May Real Estate Company on the southerly side of Cape May Harbor, and in such locations within this area as will be designated by the engineers of the Cape May Real Estate Company. The said deposit or fill to be brought up to grade established for the improvement of said property by the Cape May Real Estate Company. [This location is known as 'Low Area No. 1' New Cape May.]"

The company agreed to pay Graves "nine cents per cubic yard for each yard of material excavated and distributed upon the areas hereinbefore designated or to be designated by the engineers of the Cape May Real Estate Company." The company had no funds and Graves agreed to make advances, and for the work done and money advanced to take mortgages.

| | |
|---|---|
| He advanced in money | $116,308.41 |
| He dredged 2,676,151 cubic yards, at 9 cents | 240,853.59 |
| Total | $357,162.00 |
| He received in mortgages | 355,000.00 |

These items, as to sums, are conceded to be correct. The legality of the contract is not assailed in the bill because it was made by the company, under the control of Graves, with Graves, its president, and at the hearing it was stipulated that the price of nine cents per cubic yard for the dredging was fair and reasonable. The bill counts on the contract and the cause of complaint is its non-performance, the charge being that the money represented by the mortgages was not earned because the channel was not dug to the required depth and the material dredged was not deposited as provided in the contract. The elaborate discussion in the briefs as to the binding force of agreements between a corporation and a member of its board of directors under the principle of law laid down in *Stewart* v. *Lehigh Valley Railroad Co., 38 N. J. Law 505,* and the cases on the subject that followed is en-

tirely irrelevant. The contract is executed, and besides, it was affirmed by the stockholders. And so as to the legality of the mortgages. The power to execute them is not challenged; whether the power was lawfully exercised is raised as to the first mortgage only. It was authorized by the board of directors, of which Shields was one, at a meeting of which he charges he had no notice, and this is disproved. He had ceased to be a director when the second and third mortgages were authorized. He was present and seconded the motion to award the dredging contract to Graves which, as recorded, concludes that "payment for said dredging work to be made by creating a mortgage on the harbor lots." The motion did not authorize the execution of a mortgage, and a special meeting was called for that purpose on February 17th, 1912, at which a formal resolution was passed authorizing the $250,000 mortgage objected to. Shields was not present at this meeting but he had due notice; so the secretary testified and satisfyingly. The single question to be considered is whether Graves earned the amount he claims for dredging. It is agreed that of the two million six hundred and seventy-six thousand one hundred and fifty-one cubic yards of material excavated, one million forty-nine thousand two hundred and six yards were properly deposited in "Low Area No. 2;" one million two hundred and forty-six thousand eight hundred and seventy-two cubic yards on Two-Mile Beach and in the lower thoroughfare; sixty thousand eight hundred and seventy-eight cubic yards on Two-Mile Beach at the United States life saving station, and three hundred and nineteen thousand one hundred and ninety-five cubic yards on the meadows north of the harbor. These places were selected by the engineers of the company but the deposits were not a compliance with the terms of the contract. A true and reasonable interpretation of that instrument required of Graves to deposit the excavated materials in Low Area No. 2 until brought to grade, and thence in Low Area No. 1 until brought to grade, and if there was material over, that to be put on Two-Mile Beach. The determination of the engineers of the company to drop the material elsewhere, more conveniently, was not within his discretion. The provision of the contract that

the deposits were to be made "at such points and in such quantities as may be determined necessary by the engineers of the Cape May Real Estate Company" on the land known as New Cape May and on Two-Mile Beach was definitely excepted and subordinated to the fulfillment of the contract to "more particularly" grade Low Areas Nos 2 and 1. Within these specified areas the engineer had discretion in making the fill. His choice to dump the material on the waste land of Two-Mile Beach and in the thoroughfare instead of filling in lots for market in Low Areas Nos. 2 and 1 furnishes no excuse for the non-performance of this special feature of the contract, and his default in this respect must be charged to Graves. Low Areas No. 2 and No. 1 were available for all the materials improperly deposited elsewhere. The contract price of nine cents per cubic yard included fill as well as the excavation. It appears in evidence that six cents per cubic yard was a fair price for dredging and dumping materials conveniently and an allowance will be made at that figure. There is nothing in the evidence to show that injury to the company in failing to deposit the material in the places selected exceeds this rebate of three cents per cubic yard.

The material placed at the life saving station is a proper charge under the contract. The company was under contract to make the fill and the engineer's discretion was properly exercised.

The claim for rebate because the channel was not dug to the depth of thirty feet is without merit. The depth varied between twenty-five and thirty, and approached more nearly the latter. The company's contract with the United States called for a depth of thirty feet based upon the government's contingent agreement to dig an entrance channel of twenty-five feet in depth. It dug one but fifteen feet deep, and the utility of the company's thirty-foot deep basin and the channel of slightly lesser depth is consequently defeated. Dredging to the depth required by the government would have been sheer waste, and as Graves' default resulted in a saving to the company it has no reason to complain.

The decree will be settled on notice.